UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION


CITIZENS FOR APPROPRIATE RURAL            )
ROADS, INC.,                              )
*et al.*                                  )
                        Plaintiffs,       )
                                          )
            vs.                           )
                                          )          No. 1:11-cv-01031-SEB-DML
ANTHONY FOXX, in his official capacity as )
Secretary of the United States Department of )
Transportation,                           )
*et al.*                                  )
                        Defendants.       )

## ORDER ON MOTIONS FOR PRELIMINARY INJUNCTION AND SUMMARY JUDGMENT

This cause is before the Court on Plaintiffs' Second Motion for Preliminary Injunction

[Docket No. 141], and the parties' cross motions for summary judgment [Docket Nos. 142, 160

& 162]. For the reasons set forth below, Plaintiffs' motions for preliminary injunction and

summary judgment are DENIED, and Defendants' motions for summary judgment are

GRANTED.

## Factual and Procedural Background

This case is one of several that have come before this Court involving the extension of

Interstate 69 in Southern Indiana. The project, now in its final stages, has evolved over several

decades. In 1944, Indiana state transportation authorities initiated the first study of a highway

connecting Evansville and Indianapolis; such a route was not included in the original Interstate

Highway System, however, and the interstate eventually named I-69 reached only as far south as

the northeast suburbs of Indianapolis. Discussion of an Evansville-to-Indianapolis highway was

sparked anew in the 1990s, prompted by two Acts of Congress. The Intermodal Surface

Transportation Act of 1991, Pub. L. No. 102-240 § 1105(c), designated a potential new route from Indianapolis to Memphis, Tennessee, via Evansville as a "high priority corridor" for future development. Docket No. 161 at 4 n.6.[1] As part of the Transportation Equity Act for the 21st Century, Pub. L. No. 105-178 § 1211(i)(1)(d)(i), Congress in 1998 designated this corridor as an extension of I-69 southward from Indianapolis. *Id.*[2]

When the Federal Highway Administration (FHWA) began its review of the I-69 extension, it divided the project into two schematic "tiers." In Tier 1 of the project, the FHWA and the Indiana Department of Transportation (INDOT) reached several broad decisions about the goals of the project, its scope, and the general geographic corridor in which construction would take place. More specifically, they selected "Alternative 3C"—one of 12 routes that had received consideration—as the path the new interstate would take, connecting Evansville to Bloomington via a newly-constructed corridor and upgrading the existing State Road 37 route between Bloomington and I-465 in Southwestern Indianapolis. Docket No. 161 at 5 (citing AR ROD0000008-12).

FHWA and INDOT identified a number of programmatic goals for the project, including: (1) to improve international and interstate freight transportation, (2) to enhance regional and local transportation, (3) to facilitate economic development and growth opportunities "domestically and internationally through efficient and flexible transportation," (4) to facilitate connections to facilities that use other modes of transportation, (5) to enhance safety and to

---

[1] The two groups of defendants in this case have submitted separate briefs. We will refer to Victor M. Mendez (in his official capacity as Federal Highway Administrator), Anthony Foxx (in his capacity as United States Secretary of Transportation) and Rick Marquis (in his official capacity as the Division Administrator of the Federal Highway Administration) as the "Federal Defendants." We will refer to Karl Browning (in his official capacity as the Commissioner of the Indiana Department of Transportation) as "INDOT." The names of these officeholders have changed since the case was first filed in 2011, and the caption has changed accordingly.

[2] More detail on the early background of the I-69 project can be found in this Court's decision in *Hoosier Envtl. Council v. U.S. Dep't of Transp.*, 2007 WL 4302642 (S.D. Ind. Dec. 10, 2007) (*HEC I*), which rejected challenges to "Tier I" of the project.

reduce crashes, (6) to upgrade existing facilities to meet projected demand, and (7) to connect the cities that Congress designated for I-69, most notably Indianapolis and Evansville. Docket No. 163 at 10 (citing AR T1FEIS95). The agencies also divided "Tier 2" of the project into six sections, each corresponding to a discrete geographic stretch of the highway project, and each to receive its own Tier 2 environmental analysis. FHWA and INDOT issued a Tier 1 "Record of Decision" (ROD)—finalizing their action with respect to this stage of the project—on March 24, 2004. Docket No. 163 at xix. In *Hoosier Environmental Council v. United States Department of Transportation,* 2007 WL 4302642 (S.D. Ind. Dec. 10, 2007), this court upheld the agencies' Tier 1 decision against claims from the current plaintiffs and other organizations under the Administrative Procedure Act (APA) that aspects of the project violated federal law.

Since the Tier 1 plan was finalized in 2004, agency planning and subsequent construction work on the project's six sections have continued steadily. Final FHWA approval for Sections 1, 2, 3, 4, and 5 has now been issued, and construction on the first three sections—spanning from Evansville to near the Crane Naval Surface Warfare center—is complete. Construction on Section 4 between Crane and the Bloomington area now nears completion, while work on the final two sections between Bloomington and Indianapolis has yet to begin. *See* Docket No. 163 at xix.

The portion of the I-69 project primarily at issue in this case is Section 4. Pursuant to the National Environmental Policy Act (NEPA) and other statutory prerequisites, the FHWA and INDOT issued a Draft Environmental Impact Statement (DEIS) for Section 4 on July 23, 2010. After the required public comment period had elapsed, the agencies then issued their Final Environmental Impact Statement (FEIS) on July 13, 2011, followed by a Record of Decision on September 8, 2011. Docket No. 163 at xix. In selecting the final route and construction plan for

Section 4 from some 48 options available (within the constraints established by the Tier 1 ROD), the agencies produced a record reflecting their consideration of the plan's impact on historic sites, geological formations, and air quality, among other factors. Pursuant to their obligations under Section 7 of the Endangered Species Act (ESA), the agencies underwent consultation with the United States Fish and Wildlife Service (FWS) and issued a Biological Opinion (BiOp) regarding the possible impact of the project's tree-clearing on the endangered Indiana bat. S4AR12716.[3] Consultation was then reinitiated, and a revised BiOp for both Tier 1 and Tier 2 issued, to address the issue of "White Nose Syndrome," an affliction affecting a large number of bats in the target area. *See* T1PD26754.

Plaintiff Citizens for Appropriate Rural Roads, Inc., is an Indiana non-profit organization consisting of approximately 800 members dedicated to "educating Hoosiers about the benefits of financially responsible and environmentally sound transportation policies." Compl. ¶ 10. Plaintiff The I-69 Accountability Project is also an Indiana non-profit organization, dedicated more specifically to opposing the state and federal governments' current plans for the construction of the highway on policy, health, and environmental grounds Compl. ¶ 12. Individual Plaintiffs Andrew Knott, Michael Knott, William Boyd, Janice Boyd, Ruth Flynn, William Flynn, Sandra Tokarski, Sandra Tokarski, Thomas Jochim, Kenda Jochim, Jerry Jochim, Charlotte Paul, Ann Baas, Lynne Bergh, Darrell Breeden, Cora Young, and H. Wayne Sullivan are residents of Indiana who own property or reside within the proposed I-69 corridor or in its immediate vicinity. Compl. ¶¶ 9, 11, 13–21.

Plaintiffs filed this suit on August 1, 2011, and they moved for a preliminary injunction on December 9, 2011. Lengthy inactivity by Plaintiffs, including several missed case

---

[3] Citations to documents beginning "S4AR," "T1," "S3_PD" or similar, here and elsewhere, refer to the complete Administrative Record filed with the Court upon the request of Plaintiffs, an index of which can be found at Docket No. 125.

management deadlines by Plaintiffs' counsel, prompted the Court to dismiss Plaintiffs' first motion for preliminary injunction and direct Plaintiffs to show cause why the entire case should not be dismissed for failure to prosecute. *See* Docket No. 133.[4] Plaintiffs subsequently filed a renewed motion for preliminary injunction and a partial motion for summary judgment on Counts 1, 2, 7, 11, 13, 17, and 18 of their Amended Complaint. Docket Nos. 141, 142. INDOT and the Federal Defendants responded with their own motions for summary judgment on all counts. Docket Nos. 160, 162.

## Legal Analysis

### Standard of Review

**1. Under the Administrative Procedure Act**

Plaintiffs allege that the Defendants' actions in approving and implementing plans for the I-69 extension violated various federal statutes, including the National Environmental Policy Act (NEPA), the Clean Air Act (CAA), the Department of Transportation Act, the Endangered Species Act (ESA), and the National Historic Preservation Act (NHPA). As we shall discuss more fully below, these statutes provide the procedural or substantive standards to which agencies are bound, but Plaintiffs' cause of action is under the Administrative Procedure Act (APA), 5 U.S.C. § 551 *et seq. See Ind. Forest Alliance, Inc. v. U.S. Forest Serv.*, 325 F.3d 851, 858, 859 (7th Cir. 2003).

The APA "sets forth the full extent of judicial authority to review executive agency action for procedural correctness." *F.C.C. v. Fox Television Stations*, *Inc.*, 556 U.S. 502, 513 (2009) (citing *Vermont Yankee Nuclear Power Corp. v. Natural Res. Def. Council, Inc.*, 435 U.S. 519, 545–549 (1978)). The standard of review under the APA "is a narrow one," *see Marsh v.*

---

[4] The Court also dismissed Counts 3, 4, 5, 6, and 8, on the grounds that they were time-barred by the statute of limitations under 23 U.S.C. § 139(l)(1). *See* Docket No. 132 at 8.

*Or. Natural Res. Council*, 490 U.S. 360, 378 (1989), and the plaintiff bears the burden of proof. *See Sierra Club v. Marita,* 46 F.3d 606, 619 (7th Cir. 1995). The type of judicial review to which an agency is subject depends on whether the plaintiff challenges agency action, or agency inaction. *See* 5 U.S.C. § 706. A plaintiff claiming government inaction contrary to law must show that the governmental entity "failed to take a discrete agency action that it is required to take." 5 U.S.C. § 706(1); *Norton v. S. Utah Wilderness Alliance,* 542 U.S. 55, 72 (2004). If the plaintiff seeks to set aside agency action, he or she must show that the action was "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2). The purpose of APA review is limited; courts' role in screening for "arbitrary" or "capricious" actions is to "insist that the agency examine the relevant data and articulate a satisfactory explanation for its action." *F.C.C.*, 556 U.S. at 513 (quoting *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983)). A court does not "substitute its judgment for that of the agency," and should uphold a decision of less than ideal clarity if the agency's path may reasonably be discerned. *Id.* at 513–514.

## 2. Under Rule 56

Federal Rules of Civil Procedure 56 provides that summary judgment should be granted when the record evidence shows that "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. Pro. 56(a); *Celotex Corp. v. Catrett,* 477 U.S. 317, 322–323 (1986). The purpose of summary judgment is to "pierce the pleadings and to assess the proof in order to see whether there is a genuine need for trial." *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). Disputes concerning material facts are genuine where the evidence is such that a reasonable jury could return a verdict for the non-moving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242,

248 (1986).  In deciding whether genuine issues of material fact exist, the court construes all facts in a light most favorable to the non-moving party and draws all reasonable inferences in favor of the non-moving party.  *See id.* at 255.  However, neither the "mere existence of some alleged factual dispute between the parties," *id.*, 477 U.S. at 247, nor the existence of "some metaphysical doubt as to the material facts," *Matsushita*, 475 U.S. at 586, will defeat a motion for summary judgment.  *Michas v. Health Cost Controls of Ill., Inc.*, 209 F.3d 687, 692 (7th Cir. 2000).

Cases arising under the APA are typically resolved by summary judgment on the basis of the administrative record compiled by the agency. *See Florida Power & Light Co. v. Lorion*, 470 U.S. 729, 744–745 (1985). "The factfinding capacity of the district court is thus typically unnecessary to judicial review of agency factfinding . . . . [C]ourts are to decide, on the basis of the record the agency provides, whether the action passes muster under the appropriate APA standard of review." *Id.* at 744. *See also Cronin v. USDA,* 919 F.2d 439, 445 (7th Cir. 1990). Here, faced with cross motions for summary judgment, we therefore resolve all the claims raised by Plaintiffs without an evidentiary hearing or trial on the merits. *See Cronin*, 919 F.2d at 445.

## Discussion

Plaintiffs seek summary judgment on Counts 1, 2, 7, 11, 13, 17, and 18 of their Amended Complaint and request a preliminary injunction. Defendants' cross motion seeks summary judgment on all Counts. In addressing the cross motions, we first consider a question of ripeness affecting several of Plaintiffs' claims, before addressing the remaining Counts in turn.

## I.        Ripeness -- Counts 9, 13, 14, 15, 16, 17, and 18

In their motion for summary judgment, the Federal Defendants argue that all claims challenging the agencies' final approval of Section 4 are unripe, because the FHWA and INDOT

had not taken final action on Section 4 at the time the suit was filed. Docket No. 163 at 25–27. Plaintiffs have not responded to this argument.

The federal courts recognize ripeness as a prudential limitation on their jurisdiction—a manifestation of Article III's limitation of federal jurisdiction to "cases" and "controversies." *See Reno v. Catholic Soc. Servs., Inc.*, 509 U.S. 43, 56 (1993). Ripeness is a justiciability doctrine designed to "prevent the courts, through avoidance of premature adjudication, from entangling themselves in abstract disagreements over administrative policies, and also to protect the agencies from judicial interference until an administrative decision has been formalized and its effects felt in a concrete way by the challenging parties." *Nat'l Park Hospitality Ass'n v. Dep't of Interior,* 538 U.S. 803, 807–808 (2003) (quoting *Abbott Labs. v. Gardner,* 387 U.S. 136, 148–149 (1967)). A claim is not ripe for adjudication if it rests upon contingent future events that may not occur as anticipated, or indeed may not occur at all. *Texas v. United States*, 523 U.S. 296, 300 (1998); *Los Alamos Study Grp. v. U.S. Dep't of Energy*, 692 F.3d 1057, 1065 (10th Cir. 2012).

In the context of judicial review under the APA, a challenge to agency conduct is ripe only if it is filed after "final agency action" on the matter. 5 U.S.C. § 704; *Blagojevich v. Gates,* 519 F.3d 370, 372 (7th Cir. 2008). An agency's action is "final" if it satisfies two requirements: first, it must "mark the consummation of the agency's decisionmaking process—it must not be of a merely tentative or interlocutory nature"; second, the action "must be one by which rights or obligations have been determined, or from which legal consequences will flow." *Bennett v. Spear*, 520 U.S. 154, 177–178 (1997) (further citations omitted). An agency's issuance of a "record of decision" (ROD) generally constitutes final agency action, although other decisions signaling plan approval or a definitive agency opinion on a matter may also meet these criteria.

*See Jersey Heights Neighborhood Ass'n v. Glendening,* 174 F.3d 180, 186 (4th Cir. 1999)

(concluding that "the ROD thus signaled the end of the decisionmaking process"); *Sierra Club v.*

*U.S. Dep't of Energy*, 825 F. Supp. 2d 142, 156–157 (D.D.C. 2011) ("Regardless of whatever

steps have been taken thus far, [the agency] can change its mind . . . until it issues a Record of

Decision."). *But see Bennett,* 520 U.S. at 175 (noting that a "biological opinion" (BiOp) can

constitute final agency action for Endangered Species Act purposes).

      Here, Plaintiffs filed their suit on August 1, 2011—more than a month before the FHWA

and INDOT issued their ROD for Section 4. *See* Docket No. 1; Docket No. 163 at xix. There can

be no doubt that, at least in this context, the ROD represented the agencies' last word on the

matter, notwithstanding the earlier issuance of both a DEIS and an FEIS. *See Los Alamos,* 692

F.3d at 1065–1066 (noting that agency action was not final, even after the issuance of an EIS,

while preparations for a supplemental study were ongoing and the agency had not yet entered its

conclusive decision); *see also Sierra Club,* 825 F.3d at 156–157. The claims challenging the

decisions embodied in the Section 4 ROD were thus unripe at the time of their filing, depriving

this court of jurisdiction even if the agency decision became final in the intervening time.[5]

"[P]remature suits for review of agency decisions must be dismissed even when the passage of

time supplies the item missing at the time of filing—here, an agency decision." *Pub. Citizen v.*

*Nuclear Regulatory Comm'n*, 845 F.2d 1105, 1107 (D.C. Cir. 1988). Although summary

disposition of the claims on these grounds may seem an exercise in formalism, the bounds of

federal court jurisdiction are drawn with precision, and intentionally so. "Men must turn square

corners when they deal with the Government," *Rock Island, Ark. & La. R.R. Co. v. United States,*

254 U.S. 141, 143 (1920) (Holmes, J.), and this is all the more true in actions arising under the

---

[5] The Counts in question challenge the FHWA and INDOT's final Section 4 decision on the grounds that it violated Section 4(f) of the Department of Transportation Act (Counts 9 and 14), the Clean Air Act and Transportation Act (Count 13), the National Environmental Policy Act (Counts 16, 17, and 18) or the APA itself (Count 15).

APA, whose narrow scope of review is designed to strike a balance between the need for agency accountability and the public's interest in a government whose efficacy is not unduly undermined by perpetual and interminable litigation. *See generally Vermont Yankee*, 435 U.S. at 553–555 ("[A]dministrative proceedings should not be a game or a forum to engage in unjustified obstructionism.").

The Federal Defendants presented their argument that the claims challenging the Section 4 ROD were unripe in the opening section of their cross-motion for summary judgment. Despite the prominence of the Federal Defendants' argument and its obvious importance in determining the fate of their claims, Plaintiffs never offered a response on the issue of ripeness. *See* Docket No. 170 at 1. The wholesale failure to respond to an opposing argument results in waiver. *See Bonte v. U.S. Bank, N.A.*, 624 F.3d 461, 466 (7th Cir. 2010); *United States v. Farris,* 532 F.3d 615, 619 (7th Cir. 2008) ("Farris failed to respond to the Government's argument in a Reply Brief, and accordingly, we find that Farris waived his [claim]."). Plaintiffs' unaccountable lapse provides separate grounds for our conclusion that we have no choice but to grant Defendants' cross-motion for summary judgment as to Counts 9, 13, 14, 15, 16, 17, and 18.

## II.     Mootness – Counts 1 and 2

Counts 1 and 2 of the Amended Complaint allege that FHWA and INDOT violated NEPA and its implementing regulations by engaging in certain activities in preparation for construction on Section 4 of the project prior to the issuance of the Record of Decision for the section. Specifically, Plaintiffs charge that Defendants engaged in "final design activities, geotechnical borings, [and] tree clearing for survey work" (Count 1), as well as premature land acquisition (Count 2). Compl. ¶¶ 22–68. INDOT responds that the two Counts are moot, and we agree.

Like ripeness, the doctrine of mootness is a temporal manifestation of the jurisdictional limits imposed by Article III—that courts "may only adjudicate actual, ongoing controversies." *Honig v. Doe*, 484 U.S. 305, 317 (1988). "A case is moot when the issues presented are no longer 'live' or the parties lack a legally cognizable interest in the outcome." *City of Erie v. Pap's A.M.*, 529 U.S. 277, 287 (2000) (citing *County of Los Angeles v. Davis*, 440 U.S. 625, 631 (1979)). Regardless of whether a justiciable controversy existed at the time a suit was filed, a federal court must abjure decision on a question that intervening events have rendered moot, lest it run afoul of the judiciary's longstanding prohibition on rendering merely "advisory" opinions. *See Deakins v. Monaghan,* 484 U.S. 193, 199 (1988); *City of Erie,* 529 U.S. at 287; *A.B. ex rel. Kehoe v. Hous. Auth. of S. Bend,* 683 F.3d 844, 845 (7th Cir. 2012).

The issue of mootness has particular relevance, of course, when the relief the plaintiff seeks is a preliminary injunction. "For a preliminary injunction to be effective, it must be issued *prior* to the event the movant wishes to prevent. Once the event in question occurs, any possible use for a preliminary injunction is expired." *Kehoe*, 683 F.3d at 845 (emphasis original). Here, as INDOT points out, the claims raised by Counts 1 and 2 are moot in two respects. First, they seek to enjoin activities—*preliminary* survey work, geotechnical studies, and land acquisitions—that have long since ceased. The Defendants present uncontroverted evidence that the activities listed in Counts 1 and Count 2, to the extent that they ever took place, are now entirely complete. *See* Docket No. 160 at 21 (citing Docket No. 160, Ex. 1 at ¶¶ 8, 11–14).[6]

---

[6] Plaintiffs' only factual response to these assertions is a conclusory—and grammatically innovative—sentence/paragraph devoid of any citations to the record. They state as follows:

> Defendants to the extent they assert that Plaintiffs have no evidence to indicate that premature actions as alleged in Counts 1 and 2 occurred are making bad faith arguments as the record is clear such actions occurred and Defendants have full knowledge of such actions because they conducted them and were informed of them by Plaintiffs in communications with their counsel.

Docket No. 166 at 47. We view this as effectively non-responsive.

Second and more fundamentally, granting the relief sought by Plaintiffs would be impossible. In the Amended Complaint, Plaintiffs urge the Court to "enjoin the commissioner of INDOT from committing substantial resources to a particular course of action pending issuance of a signed Record of Decision (ROD) required by NEPA." Compl. ¶ 60. But the ROD was issued on September 8, 2011; an injunction now would have only rhetorical value, and Plaintiffs do not seek damages. *See James Luterbach Constr. Co. v. Adamkus,* 781 F.2d 599, 600 (7th Cir. 1986) (holding that a suit seeking declaratory and injunctive relief against a construction project was moot after the project was completed because no money damages were sought); *see also Dan Caputo Co. v. Russian River Cnty. Sanitation Dist.*, 749 F.2d 571, 574 (9th Cir. 1984); *H.K. Porter Co., Inc. v. Metro. Dade Cnty.,* 650 F.2d 778, 782 (5th Cir. 1981).

Plaintiffs retort that notwithstanding these facts, this case is subject to the mootness exception for claims "capable of repetition yet evading review." Docket No. 166 at 45–46 (citing *Murphy v. Hunt*, 455 U.S. 478, 482 (1982)). Besides referring in conclusory fashion to this long-established exception, however, Plaintiffs offer no support for their argument, which we conclude is unavailing.

Even if intervening events would ordinarily have rendered a controversy moot, the Supreme Court has recognized that jurisdiction may still exist where the mootness doctrine would otherwise work a systemic injustice on a plaintiff. *See, e.g.*, *Roe v. Wade*, 410 U.S. 113, 125 (1973) (intervening end of plaintiff's pregnancy did not moot her case). Cases are "capable of repetition, yet evading review" where two criteria are present: "(1) the challenged action was in its duration too short to be fully litigated prior to its cessation or expiration, and (2) there is a reasonable expectation that the same complaining party will be subjected to the same action again." *Adamkus*, 781 F.2d at 600 (quoting *United States v. Peters,* 754 F.2d 753, 758 (7th Cir.

1985)); *see also Gannett Co., Inc. v. DePasquale,* 443 U.S. 368, 377 (1979). Here, it is not clear from the Amended Complaint exactly how long Defendants' alleged preparatory activities had been occurring prior to the September 2011 issuance of the ROD; however, Plaintiffs refer to land purchase offers occurring as early as April 2011. Compl. ¶¶ 54–56. At the very least, it seems unlikely that resolution of the claims within the necessary time window would have been impossible, had Plaintiffs taken more prompt action. *Cf. Adamkus*, 781 at 602 ("the [project] was not built in a day"). Interstate highway projects are invariably lengthy ones, and there is no reason to believe that, despite their failure to make a timely challenge to the preliminary activities here, Plaintiffs would be unable to do so in the future should a similar situation arise. *See Neighborhood Transp. Network, Inc. v. Pena,* 42 F.3d 1169, 1173 (8th Cir. 1994) (holding that a challenge to a highway project was "mooted before this appeal could be addressed. It does not follow, however, that similar future cases will evade review. Future projects may be sufficiently time-consuming so as to permit appellate review.")

Regardless, there is no reasonable expectation that these Plaintiffs *themselves* will be subjected to the same action again. Unlike controversies surrounding political elections, *see Int'l Org. of Masters, Mates & Pilots v. Brown*, 498 U.S. 466, 472–473 (1991), a newspaper's access to court trials, *Globe Newspaper Co. v. Super. Ct. for Norfolk Cnty.*, 457 U.S. 596, 602 (1982), labor-management disputes within a business, *Burlington N. R.R. Co. v. Brotherhood of Maint. of Way Emps.*, 481 U.S. 429, 436 n.4 (1987), or a human pregnancy, *Roe*, 410 U.S. at 125—to name a few examples—the I-69 project is a *sui generis* factual situation. Although the state and federal governments will, of course, commence other highway projects affecting other people's land, it is unlikely that these particular landowners will be suffering this type of alleged injury again. *See People for the Ethical Treatment of Animals, Inc. v. Gittens,* 396 F.3d 416, 424 (D.C.

Cir. 2005) (noting that, where a "controversy is highly fact-specific . . . conclud[ing] that a dispute like this would arise in the future requires us to imagine a sequence of coincidences too long to credit.").

Because they offer us no opportunity to adjudicate a live dispute in a manner that produces a legally significant result, we conclude that Counts 1 and 2 must be dismissed as moot. Defendants' motions for summary judgment on these counts are accordingly granted.

## III.    Count 7 – Supplemental Environmental Impact Statement (SEIS)

Plaintiffs' Count 7 alleges that FHWA and INDOT violated NEPA by failing to prepare a supplemental environmental impact statement (SEIS) in response to new developments related to: (1) air qualities standards under the Clean Air Act, (2) the impact of the project on the endangered Indiana bat, and (3) the impact of the project on certain historic sites. Compl. ¶¶ 113–119.

Whenever a federal agency proposes to engage in "major federal action," NEPA requires that the agency prepare a detailed report known as an Environmental Impact Statement (EIS). 42 U.S.C. § 4332(2)(C). Federal regulations further require that, under certain circumstances, the agency must respond to important changes by preparing a Supplemental Environmental Impact Statement (SEIS). 40 C.F.R. § 1502.9. Agencies must prepare a SEIS if either: (1) the agency makes substantial changes in the proposed action that are relevant to environmental concerns, or (2) there are *significant* new circumstances or information relevant to environmental concerns and bearing on the proposed action or its impacts. *Id.*[7]

The Seventh Circuit has held that courts should evaluate an agency's decision not to prepare an EIS according to the standard of review set forth in Section 706(2)(A) of the APA,

---

[7] The FHWA has its own, similar, regulations, found at 23 C.F.R. § 771.130.

which provides that a decision is to be set aside only if it is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." *Wisconsin v. Weinberger*, 745 F.2d 412, 417 (7th Cir. 1984). In this context, Section 706 review is limited to ensuring that the agency took a "hard look" at the evidence before reaching a decision, and that the decision it did reach was made on a rational basis. *Id.*; *see also State Farm*, 463 U.S. at 43 (explaining "hard look" review); *Bowman Transp., Inc. v. Arkansas-Best Freight System, Inc.*, 419 U.S. 281, 285 (1974) (setting forth the core requirement of a rational basis for all decisions). When an agency has already submitted an EIS, its decision whether or not to prepare a supplemental EIS is lent an additional layer of deference:

> An important difference between an agency's decision whether to file an initial EIS and its decision whether to supplement an EIS is that the decision to supplement is made in light of an already existing, in-depth review of the likely environmental consequences of the proposed action. Thus, it seems clear that the principal factor an agency should consider in exercising its discretion whether to supplement an existing EIS because of new information is the extent to which the new information presents a picture of the likely environmental consequences associated with the proposed action not envisioned by the original EIS. As one court has stated, "[t]here is no benefit in taking another 'hard look' at an action if that view is taken from the same vantage point and overlooks the same environmental panorama." The issue is whether the subsequent information raises new concerns of sufficient gravity such that another, formal in-depth look at the environmental consequences of the proposed action is necessary. The supplementation process is extensive and an agency's determination as to when one is or is not needed is entitled to some deference. We hold, therefore, that an agency cannot have acted arbitrarily or capriciously in deciding not to file a SEIS unless the new information provides a *seriously* different picture of the environmental landscape such that another hard look is necessary.

*Weinberger*, 745 F.2d at 418. (emphasis original). Thus, determining whether a SEIS is necessary is "a task assigned to the special competency of the appropriate agencies," subject to review only of the agencies' procedural diligence and substantive rationality. *Habitat Educ. Ctr., Inc. v. U.S. Forest Serv.,* 673 F.3d 518, 528 (7th Cir. 2012).

With this general standard at hand, we now address in turn the three grounds on which Plaintiffs claim a SEIS was necessary.

**A. Impact on the endangered Indiana bat**

Plaintiffs argue that the I-69 project's impact on the Indiana bat requires the preparation of a SEIS for Section 4 in two different respects.[8] First, they contend that "white-nose syndrome," a fungal disease afflicting a large number of Indiana bats, has an impact so severe that "the Indiana bat can ill afford any additional habitat destruction or direct taking from I-69 because the Indiana Bat is literally in danger of extinction as a species." Docket No. 143 at 22. In support of this position, they cite a 2013 report detailing the impact of the disease on area populations. *Id.* Ex. 4.[9] Second, they assert that the agencies or their contractors have engaged in tree-clearing that violates the FWS's "Incidental Take Statement" governing permissible project impacts on the Indiana bat. They consider these tree-clearings to constitute "substantial changes in the proposed action that are relevant to environmental concerns," thus requiring a SEIS under federal regulations. *See* 40 C.F.R. § 1502.9. Neither argument is persuasive.

**1. White-nose syndrome**

Pursuant to their obligations under Section 7 of the Endangered Species Act, FHWA and INDOT entered formal consultations with FWS prior to the commencement of the I-69 project to ensure that the project was not likely to jeopardize the Indiana bat's continued existence. *See* 16

---

[8] Plaintiffs also assert a third ground necessitating a SEIS relating to the Indiana bat: that the agencies did not include the results of certain consultations with FWS in their Draft EIS for Section 4. This argument, however, fails to fit within the legal framework necessary to state a claim under NEPA. This alleged failure to publicize the full results of inter-agency consultation for notice and comment is neither a significant change in environmental circumstances nor a "substantial change" in the agency's proposed action with respect to I-69. *See* Docket No. 161 at 32 n.28. We will thus not consider the argument further.

[9] This report, which Plaintiffs refer to as an "FWS Study," is actually an article in the scholarly journal *Conservation Biology.* We cannot say whether or not it was authored by researchers affiliated with FWS, but at the very least Plaintiffs' labeling is misleading. Because the report does not bear directly on the question at hand, we need not resolve Defendants' objections to its admittance as evidence outside the scope of the Administrative Record. *See* Docket No. 163 at 24–25 (Federal Defendants' arguments against extra-record exhibits); Docket No. 161 at 16–19 (INDOT's parallel argument).

U.S.C. § 1536(a)(2). In 2003, FWS issued its "Biological Opinion" (BiOp) for Tier 1 concerning

impacts on the Indiana bat; the opinion found that I-69 would impact the bats, but fall short of

jeopardizing the species or posing an existential threat to its habitats. T1FEIS3; S4AR1482-88.

After field testing by INDOT agents in 2004 revealed new information about bat habitats in the

area, INDOT, FHWA, and FWS re-initiated formal consultation. The fruit of this renewed

analysis was the Tier 1 Revised BiOp; the opinion largely affirmed FWS's earlier conclusions

about the acceptable projected impact. S4AR1490. Further consultations during Tier 2 produced

BiOps for the individual project Sections, including Section 4. Docket No. 163 at 31 (citing

T1PD26782; S4AR12716).

 In 2011, in response to the phenomenon of white-nose syndrome, the agencies initiated

formal consultation for a third time. FWS's Amendment to the Revised Tier 1 BiOp concluded

once again that, even taking into account the new disease, the project would have none but

acceptable levels of impact on the bats. S4AR1490–1500.[10] Bat surveys conducted as part of

preliminary work for Section 5 of the project (north of Section 4) prompted the agencies to re-

initiate consultation yet again in 2012. The result of this fourth round of analysis with respect to

the Indiana bat was another Amendment to the Tier 1 BiOp, issued on July 24, 2013. Docket No.

160 Ex. 4 (Sturgeon Declaration). These consultations occurred in parallel with preparation of

the agencies' EISs for Tiers 1 and 2, all of which reflect the consultations' results. *See*

S4AR001486–88 (table summarizing the history of Section 7 consultation between agencies).

 Thus, the FEIS in 2011 incorporated the results of analysis of white-nose syndrome's

impact on the environmental footprint of the I-69 project, and a renewed study undertaken after

the FEIS affirmed those conclusions. In its most recent statement, FWS related that the project

---

[10] As the Federal Defendants point out, FWS actually found that the "conservation easements" created as a result of
the I-69 project will *benefit* the bats' habitat. S4AR1490–1507.

will take a relatively small number of bats, and that mitigation efforts, including conservation easements and "reforestation and restoration efforts, will more than offset the anticipated direct forest and wetland loss [and] ensure suitable bat habitat[s] remain[] in the area in perpetuity." Docket No. 160 Ex 4. at 27.[11] Plaintiffs muster no evidentiary support for their claim that "significant new circumstances or information" coming to light after the FEIS's publication mandate its supplementation; the only source they cite is a report in a scientific journal detailing the risks of the disease in general. *See* Docket No. 143, Ex. 4. The report says nothing, of course, on the interaction between white-nose syndrome and the I-69 project. Since determining the "significance" of new environmental circumstances is a "factual question requiring technical expertise," *see Habitat Educ. Ctr.*, 673 F.3d at 528–529 (citing *Town of Winthrop v. F.A.A.*, 535 F.3d 1, 8 (1st Cir. 2008)), deference to the result of their decision is generally appropriate. *See id.*; *Lands Council v. McNair,* 629 F.3d 1070, 1074 (9th Cir. 2010). Here, the evidently comprehensive nature of the consultations—and the absence of any evidence that the end result was unreasonable—impel us to the conclusion that the agencies' decision not to issue a SEIS was not "arbitrary and capricious."

### 2. Tree-clearing operations

Plaintiffs also contend that the project has caused the felling of trees hosting bat colonies, and that this constitutes both a violation of the FWS's "Incidental Take Statement" for the bats and a significant change in the scope of the project necessitating the preparation of a SEIS.

In their motion for summary judgment, Plaintiffs point to two sources to substantiate their account of the unauthorized tree felling. *See* Docket No. 143 Ex. 6; S4AR08795. The evidence

---

[11] We agree with INDOT that the re-initiation of Section 7 consultation pursuant to the ESA in 2012 does *not* necessarily imply that the agencies should have undertaken a supplemental EIS. The standard for NEPA supplementation is higher than that imposed by the ESA. *See* Docket No. 161 at 31 n.27 (citing *Karuk Tribe of Cal. v. Forest Serv.*, 681 F.3d 1006, 1024 (9th Cir. 2012)).

tends to show that, in August 2011, at least one tree was felled by an INDOT contractor; if true, this contravened the Section 4 FEIS, which prohibited removing "trees with a diameter of 3 or more inches . . . between August 1 and September 30" to avoid adverse impact on the Indiana bat. *See* S4AR1527; S4AR12356. The same INDOT memorandum to FHWA relied upon by Plaintiffs to substantiate their allegation of tree-felling, however, makes clear that the incident's impact on Indiana bats was minimal or nonexistent. A specialist investigated the fallen tree and determined that it had not been used as a "maternity tree" for the Indiana bat, and the agency took steps to ensure that further tree-removal in violation of the FEIS did not occur, including: firing the supervisor responsible for the felling of the tree, re-training of contractor employees on the Indiana bat issue, and additional mapping of trees with diameter greater than three inches within the project area to ensure their protection. Docket No. 143, Ex. 6 at 2. Plaintiffs have presented no evidence that the tree-clearing impacted the Indiana bat in any respect; in the absence of such evidence, we cannot conclude that this apparently isolated incident represented a significant change in either the scope of the project or the environmental circumstances, and therefore we cannot say that the failure to prepare a SEIS violated NEPA.

**B. Air quality impacts under the Clean Air Act**

Plaintiffs contend that the agencies also should have prepared a SEIS because new vehicle registration data show that Greene County, which lies astride Sections 3 and 4 of the project, would not be in conformity with the requirements of the Clean Air Act as a result of the increased vehicular traffic created by the interstate. Docket No. 143 at 20–22.

**1. Applicable Standard**

The Clean Air Act (CAA) gives the EPA responsibility for formulating National Ambient Air Quality Standards (NAAQS), establishing maximum permissible concentrations of certain

pollutants in the air; the CAA also devolves upon the states the responsibility to ensure their compliance with these standards. *See* 42 U.S.C. §§ 7408, 7409, 7407(a). The states satisfy this requirement by promulgating State Implementation Plans (SIPs). 42 U.S.C. § 7410(a)(1). Part of the function of the SIPs is to bring counties or municipalities that fall short of the air quality standards (known as "non-attainment" areas) into compliance with the standards. *See* 42 U.S.C. §§ 7407(d)(1)–(2); 7410(a)(1). If a local jurisdiction regains compliance with the air quality standards, it is given probationary status as a "maintenance area"; SIPs must include plans to maintain air quality conformity in all "maintenance" areas within a state. 42 U.S.C. § 7505a(a).

The CAA also binds federal agencies. Its "conformity" provision states that no federal agency shall "engage in, support in any way or provide financial assistance for, license or permit, or approve, any activity which does not conform to [a SIP]." 42 U.S.C. § 7506(c). The agency's determination on conformity is to be based on "the most recent estimates of emissions." *Id.* at § 7506(c)(1)(B). As of 2011, Greene County, Indiana was a "maintenance area." Compl. ¶ 74(d)(vii).

### 2. Merits of the claim that a SEIS was required

Regulations implementing the CAA provide that agencies mulling federal action should form interagency consulting groups to guide their attempts to comply with the CAA's "conformity" requirement. 40 C.F.R. § 90.105(b). FHWA and INDOT accordingly consulted with EPA and the Indiana Department of Environmental Management (IDEM) to perform their conformity analysis—the key issue for which was ensuring that in Greene County, a "maintenance area," emissions of ozone component gases did not exceed threshold levels. S4AR1298. One analytical tool in the conformity analysis is "fleet mix" data, which extrapolates

air pollution quantities based on the model and age of the cars on the road in a given area. Indiana agencies had performed a "fleet mix" study in 2004, and they performed a new study in 2009. As Defendants concede, initial analysis of this 2009 data showed an older mix of cars than had been expected, meaning that pollution levels per vehicle were projected to be higher. S3_PD002560–2561. The agencies, acting in consultation with one another, eventually determined not to use this new data in their conformity analyses until it had been "quality assured." *See* Docket No. 163 at 18 (citing S4AR58920–21; S4AR64776–77). The Section 4 FEIS and ROD thus incorporated the older 2004 data, and the quality assurance analysis on the 2009 data was not completed until October 2011—after the agency had taken final action with respect to Section 4. It is the decision not to use the 2009 data that Plaintiffs now challenge.

Plaintiffs support their contention that the agencies' decision was "arbitrary and capricious" by pointing to both pre-decisional interagency emails and the statements of an unidentified "whistleblower" within INDOT. The emails in the record paint a picture of the agencies' collective awareness that the new data might jeopardize Greene County's compliance; they also show that some agency officials, most notably FHWA representative Larry Heil, urged that local authorities should complete their new transportation plans before the 2009 data were finalized and showed the agencies' conscious desire to complete their FEIS and ROD for Section 4 without having to rely on those problematic 2009 numbers. *See, e.g.*, S3_4PD008530 ("It is very important that the MPOs [Metropolitan Planning Organizations] update their Transportation Plans . . . using the 2004 Vehicle Fleet Mix data, and initiate the public comment process before the 2009 Vehicle Fleet Mix Data is released."). Plaintiffs' "whistleblower" statements are submitted in an affidavit by counsel Mick Harrison. He asserts that an unnamed INDOT official recounted to him that the agencies had consciously delayed or suppressed the 2009 data until

after the final Section 4 decisions were published, and that FHWA personnel consciously referred to this effort as a "delaying tactic." Docket No. 166 Ex. 5 (Harrison Affidavit) at ¶¶ 14, 17 (referring to "smoking gun" evidence). The statements contained in this affidavit, however, are inadmissible—as the statements of a non-testifying third party offered for their veracity, they are hearsay not subject to any exception recognized by the Federal Rules of Evidence. *See id.*; *see also* Fed. R. Evid. 801, 802; *Tomanovich v. City of Indianapolis*, 2005 WL 4692616, at *1 (S.D. Ind. Feb. 10, 2005).[12] We accordingly consider none of the "whistleblower" evidence here.

The record evidence designated by Plaintiffs is sufficiently persuasive that, if Plaintiffs' claim were a facial challenge to the agencies' decision to exclude the 2009 data from the FEIS and ROD, it would present a close question.[13] But Count 7 alleges that Defendants violated NEPA by failing to *supplement* their EIS—in other words, by failing to respond properly to new circumstances that developed after they issued the FEIS and ROD in 2011.[14] The only relevant agency decision that post-dates the Section 4 ROD is the 2009 data Quality Assurance Report, published on October 25, 2011. S3_4PD002560–61. Plaintiffs do not demonstrate that this report causes Section 4 of the project to be in non-conformity with the SIP for Greene County, and at any rate the question has since become immaterial. Even taking the 2009 data into account, the EPA has since upgraded Greene County's status to an "attainment area," meaning that it meets

---

[12] Defendants anticipate, and repudiate, any argument that the whistleblower's comments are "statements of a party opponent" within the hearsay exception provided by Fed. R. Evid. 801(d)(2)(D). Only the statements of certain higher-ranking employees of an organization are attributable to the organization for the purposes of Rule 801, and it is inappropriate to treat an anonymous source as speaking on behalf of the agency. *See Indianapolis Minority Contractors Ass'n, Inc. v. Wiley,* 1998 WL 1988826, at *16–17 (S.D. Ind. May 13, 1998).

[13] By no means would it be clear even in that context, however, that Defendants' action was "arbitrary and capricious." As the Federal Defendants point out, EPA regulations do allow a conformity determination to be based on the latest planning assumptions in force at the time that the conformity analysis *begins*, rather than the time of its issue. 40 C.F.R. § 93.110(a). FHWA and INDOT did engage in the required interagency consultation, and the justification they offered for their final decision—that it would be unwise to use data not yet quality-assured—is at least superficially plausible. *See* Docket No. 163 at 45 (citing 40 C.F.R. § 93.105(c)(1)(i)).

[14] Count 13, which does challenge the Section 4 ROD directly on Clean Air Act grounds, has been dismissed as unripe. *See supra* § I.

the national air quality standards. 77 Fed. Reg. 30,088, 30,118 (May 21, 2012). Section 4 thus does not violate the CAA's "conformity" provision, 42 U.S.C. § 7506(c), and Plaintiffs have pointed to no other post-decisional developments that would mandate a supplemental EIS. *See Border Power Plant Working Grp. v. U.S. Dep't of Energy*, 260 F. Supp. 2d 997, 1021 (S.D. Cal. 2003) ("If ambient air quality standards are designed, as they are, to protect human health, then a finding that the projects do not violate those standards logically indicates that they will not significantly impact public health.").

### 3. Fraud on the court and Plaintiffs' request for additional discovery

In their response to Defendants' cross-motions for summary judgment, Plaintiffs hardly advance their original arguments for the necessity of a SEIS. Instead, they change tack, insisting that the conduct of Defendants' counsel amounts to a fraud on the court and a violation of the rules of professional conduct; they further contend that this bad faith by both counsel and the agencies themselves warrants additional discovery and forecloses a grant of summary judgment in favor of Defendants. "Plaintiffs should be permitted . . . pursuant to the law applicable to fraud on the court and Fed. R. Civ. Pro. 56(d) . . . to conduct reasonable discovery on the fraud on the court, violation of the duty of candor and regarding the key 'smoking gun' and related evidence omitted from the agency record." *See* Docket No. 166. We need address these insubstantial arguments only briefly.

### a. "Fraud on the court"

The gist of Plaintiffs' argument here is that INDOT's counsel withheld from the Court "key material facts" related to Counts 7 and 13 by not disclosing in their briefs the existence of the INDOT whistleblower or the contents of his allegations against the agencies. Docket No. 166

at 22–23. Plaintiffs provide breathtakingly lengthy quotations from decisions of the Supreme

Court and other circuit courts affirming the proposition that fraud on the court can warrant the

setting aside of judgments. But here there has been no final judgment, nor has there been fraud

on the court. As the Seventh Circuit has explained, fraud on the court occurs only in the most

extraordinary and "egregious" circumstances—"conduct that might be thought to corrupt the

judicial process itself, as where a party bribes a judge or inserts bogus documents into the

record." *Oxxford Clothes XX, Inc. v. Expeditors Intern. of Washington, Inc.*, 127 F.3d 574, 578

(7th Cir. 1997). Where, as here, there is no final judgment to overturn, a claim of fraud on the

court is not cognizable, regardless of how egregious a litigant's alleged conduct may be. *See*

*Henderson v. Marker,* 2014 WL 886833, at *8 (N.D. Ill. Mar. 5, 2014); *see also* Fed. R. Civ. Pro.

60(b)(3) (the proper vehicle for bringing a fraud on the court motion to set aside judgment).

Plaintiffs also devote five full pages of their response brief to a block quotation from the

Fourth Circuit's decision in *United States v. Shaffer Equipment Co.,* 11 F.3d 450 (4th Cir. 1993).

To the extent we are able to distill a cogent legal argument from this indiscriminate, verbatim

recitation of non-binding case law, Plaintiffs seem to cite the case for two propositions: that

courts in APA cases can look beyond the administrative record when faced with "bad faith or

improper behavior" by agencies, and that courts have an "inherent power to dismiss a case for

the misconduct of counsel." *See* Docket No. 166 at 13–14. Plaintiffs' reliance on *Shaffer*

*Equipment* is bewildering, since that case's facts readily demonstrate its inapplicability. In that

case*,* an EPA agent had concededly committed perjury before the court; nevertheless, the Fourth

Circuit concluded that dismissal of the agency's cost recovery suit under CERCLA was too

severe a remedy, opting to punish the misconduct with lesser sanctions. 11 F.3d at 463. Here,

Plaintiffs rely only on a hearsay statement to support the theory that INDOT withheld key

material facts. *See* Docket No. 166 Ex. 6. We thus have no admissible evidence of misconduct before us. Moreover, as INDOT points out, the disclosures already made by the agencies contain numerous inter-agency emails showing officials' desire to avoid using the 2009 data; given this, the contention that the "whistleblower" information was withheld to protect the façade of the agencies' unimpeachable motives is hard to sustain. *See* Docket No. 169 at 6 (citing S3_4PD008530). To the extent that Plaintiffs are urging us to react to Defendants' bad faith conduct by looking beyond the Administrative Record to sustain their Count 7 CAA theory, they have put the cart before the horse; their only basis for alleging that the parties were dishonest to the Court in the first place rests on speculation, and no admissible evidence warrants such a leap.[15]

### b. Rule 56(d)

Plaintiffs also seek to stave off summary judgment by seeking additional discovery under Federal Rules of Civil Procedure Rule 56(d). The Rule provides: "If a nonmovant shows by affidavit or declaration that, for specified reasons, it cannot present facts essential to justify its opposition, the court may: (1) defer considering the motion or deny it; (2) allow time to obtain affidavits or declarations or to take discovery; or (3) issue any other appropriate order." Fed. R. Civ. Pro. 56(d); *Columbus Reg'l Hosp. v. Fed. Emergency Mgmt. Admin.*, 2012 WL 1066793, at *2 (S.D. Ind. Mar. 28, 2012). "Discovery is generally not appropriate for claims brought under the APA, and judicial review of the agency's action is based upon the record the agency presents to the reviewing court." *Fla. Power & Light Co. v. Lorion*, 470 U.S. 729, 743–744 (1985). Only under rare circumstances—where a plaintiff can make a "strong showing" that there has been

---

[15] Whether the original decision to rely on the 2004 data was made in "bad faith" is, of course, a separate question. Plaintiffs here allege that Defendants violated their duty of candor to the tribunal, and only bad faith connected with this litigation itself is relevant.

bad faith, or that the record is incomplete—will a rule 56(d) motion be granted in an APA case. *See Columbus Reg'l Hosp*., 2012 WL 1066793, at *2.

Even outside the restrictive APA context, consideration of two factors often guides courts in weighing requests for additional discovery under Rule 56(d). First, courts consider whether the party opposing summary judgment has shown what additional facts would be necessary to avoid summary judgment, and demonstrate that the new discovery would succeed in defeating the summary judgment motion. *See Convertino v. U.S. Dep't of Justice*, 684 F.3d 93, 99 (D.C. Cir. 2012). A conclusory assertion that additional discovery is needed will not suffice. *See Naoko Ohno v. Yuko Yasuma,* 723 F.3d 984, 1013 n.29 (9th Cir. 2013). Second, as Plaintiffs concede, courts consider whether the non-moving party has been diligent in pursuing discovery. *Brill v. Lante Corp.*, 119 F.3d 1266, 1269, 1275 (7th Cir. 1997); *Rivera-Almodovar v. Instituto Socioeconomico Comunitario, Inc.*, 730 F.3d 23, 28–29 (1st Cir. 2013); *see also* Docket No. 166 at 16.

Even leaving aside their failure under APA review to make a "strong showing" that the opposing parties' misconduct entitles them to seek review beyond the Administrative Record, Plaintiffs have fallen short of demonstrating the need for relief under background Rule 56(d) principles. Although the Harrison Declaration describes the statements of the INDOT "whistleblower" in some detail, Plaintiffs have failed to show how more detailed insight into the agencies' decision-making process *before* the FEIS and ROD were issued—even if that evidence shows a greater level of misconduct—would bolster their claim under Count 7 that new developments *after* the FEIS and ROD warranted a supplemental impact statement. Plaintiffs have also been anything but diligent heretofore in pursuing discovery, as this case's history shows. In July 2012, the Court set two deadlines for Plaintiffs to demonstrate why the

Administrative Record lodged by Defendants was insufficient. Docket No. 129 (Case Management Plan). Plaintiffs failed to meet these deadlines, and the dilatory nature of Plaintiffs' counsel's conduct of the case prompted the Court in March 2013 to order Plaintiffs to show cause why the entire suit should not be dismissed for failure to prosecute. Docket No. 133. Although we ultimately declined to grant defendants' motion to dismiss on these grounds, we lamented Plaintiffs' "frustrating and persistent . . . tardiness." Docket No. 150 at 5.

As we have previously noted, Plaintiffs have failed to make a persuasive showing that Defendants have engaged in misconduct in their defense of this litigation. *See supra,* § III(B)(3)(a). Nor have they demonstrated that any other special circumstances warrant additional discovery. For these reasons, we conclude that their invocation of Rule 56(d)—or other equitable doctrines concerning fraud on the court or attorney misconduct—is unavailing to forestall summary judgment against them on their Count 7 CAA theory.

## C. Historic Sites

Plaintiffs' final contention with regard to Count 7 is that "the original NEPA Section 3 Tier 2 FEIS process must be supplemented via a SEIS due to the fact that significant new information has become available regarding historic sites." Compl. ¶ 125. Specifically, Plaintiffs argue that the Section 3 area contains two historic bridges and the "Scotland Historic District," sites that the agencies wrongly ordered to be reclassified in order to avoid the protections of the National Historic Preservation Act. Compl. ¶¶ 94–101.

The inclusion within Count 7 of a claim that information regarding historic cites mandated a SEIS for Section 3 appears to be an error, because it is duplicative of an earlier, rejected claim. Count 5 of Plaintiffs' Amended Complaint sought a Section 3 SEIS on the same

grounds. *See* Compl. ¶¶ 87–101. Count 5, however, was dismissed with prejudice as time-barred. *See* Docket No. 132 at 7–9. In their subsequent briefing on Count 7, Plaintiffs never argue for a SEIS based on the historic sites—indeed they never mention the historic sites at all, focusing entirely on the Indiana bat and auto emissions.

If Plaintiffs intended to seek supplementation of the Section 3 FEIS in Count 7, the claim is time-barred just as Count 5 was. *See* 23 U.S.C. § 139(l)(1). If they intended to seek supplementation of the *Section 4* FEIS on the basis of new information about the historic sites, they have failed entirely to carry their evidentiary burden. In Count 7, Plaintiffs incorporate by reference allegations about the historic sites contained in previous counts of the Complaint. *See* Compl. ¶¶ 94–101. None of these allegations, however, involve conduct that post-dated the Section 4 FEIS and ROD. In fact, Plaintiffs allege that the information they discovered regarding the mis-classification of the bridges and Scotland Historic District came to light as part of their review of the documents from the interagency consultation process for Section 4. In other words, any decisions taken by the Defendants—whether proper or improper—were a *fait accompli* by the time the Section 4 decision was finalized. At any rate, Plaintiffs present no evidence in support of their view that these sites had been "declared eligible and then reclassified as ineligible . . . by the use of a highly irregular procedure and double standard." *Cf.* Compl. ¶ 97. Documentation of the Section 4 interagency consulting process with regard to FHWA and INDOT's obligations under the Historic Preservation Act is in the Administrative Record, and we have no grounds to dispute the sufficiency of the process the agencies followed. S4AR54507; S4AR54515–54518. Absent faulty process or irrational result, it is beyond the scope of our review to scrutinize the decisions reached by the agencies here.

For these reasons, we grant Defendants' motion for summary judgment on Count 7 as to all three of Plaintiffs' theories that NEPA required the agencies' preparation of a supplemental EIS for Section 4.

## IV.    Counts 10, 11, and 12 – Endangered Species Act (ESA) violations

Counts 10, 11, and 12 of the Amended Complaint assert that Defendants violated their obligations under the Endangered Species Act (ESA) with respect to the endangered Indiana bat. Count 10 alleges that the agencies' construction activities in Section 4 ran afoul of 16 U.S.C. § 1536(a)(2), which provides that federal agencies must ensure that no activity they undertake or fund is "likely to jeopardize the continued existence of any endangered species or threatened species." Compl. ¶ 150 (citing 16 U.S.C. § 1536(a)(2)). Relatedly, Count 11 charges that FHWA violated 16 U.S.C. § 1536, and acted in an "arbitrary and capricious" manner in violation of the APA, by failing to reinitiate formal consultation with FWS when they learned that tree-cutting activities and construction activities in the bats' habitat would constitute a greater "take" of the bats than originally anticipated in the FWS's Biological Opinion. Compl. ¶¶ 170–178. Lastly, Count 12 alleges that the agencies engaged in a "taking" of the endangered bat in violation of Section 9 of the ESA, 16 U.S.C. § 1536(a)(1)(B). Compl. ¶¶ 179–186. We follow the lead of the parties in addressing these three counts jointly.

Defendants attack these claims on several grounds. The Federal Defendants argue that Plaintiffs lack standing to bring these ESA claims, because their declarations do not demonstrate a "concrete and particularized" interest in the well-being of the Indiana bat populations in question sufficient to satisfy Article III's "injury in fact" requirement. *See* Docket No. 163 at 39. INDOT argues that the claims fail because Plaintiffs did not satisfy the 60-day notice

requirement imposed before "citizen suits" under the ESA may be brought in court. *See* Docket No. 161 at 38 (citing 16 U.S.C. § 1540(g)(2)(A)(i)); *Am. Rivers v. Nat'l Marine Fisheries Serv.*, 126 F.3d 1118, 1124 (9th Cir. 1997)).[16] Both groups of Defendants also argue that all three Counts fail on the merits. As to Count 10, they insist that the record demonstrates that the agencies underwent the thorough consultations prescribed by law with respect to the Indiana bat, and they note the lack of any evidence that their activities have, in fact, "jeopardized" bat habitats beyond the level envisioned in the "Incidental Take Statement" and Biological Opinion issued by FWS. Docket No. 163 at 39–42; Docket No. 161 at 42. As to Count 11, Defendants argue that FHWA and INDOT re-instituted consultation on the issue of tree-clearing in 2012, rendering incoherent Plaintiffs' contention that they violated the ESA by failing to re-initiate consultation. Docket No. 163 at 42–43. Finally, as to Count 12, Defendants contend that Plaintiffs have failed to meet the high burden imposed on a plaintiff seeking to prove that federal agencies engaged in illegal "taking" of endangered species. Docket No. 163 at 43–44 (citing *Am. Bald Eagle v. Bhatti*, 9 F.3d 163, 165 (1st Cir. 1993) ("[The] proper standard for establishing a taking under the ESA, far from being a numerical probability of harm, [is] unequivocally defined as a showing of actual harm.")).

Plaintiffs have not sought summary judgment on Counts 10 or 12. Nor have they responded to any of Defendants' arguments as to any of the three claims—whether on standing,

---

[16] INDOT separately contends that Count 11 must be dismissed as moot, because the agencies already engaged in the precise type of inter-agency consultation the absence of which is the basis of Plaintiffs' claim. Docket No. 161 at 39; *see also* Docket No. 169 at 12–13. Plaintiff responds to this only in conclusory fashion, stating, without further argument or support, that "the claim is not moot under the well-established doctrine of capable of repetition yet evading review." Docket No. 166 at 44. We have already discussed this issue in relation to Counts 1 and 2. Although we do not rest our disposition of these claims on mootness grounds, it is likely that reliance on the "capable of repetition, yet evading review" exception to mootness doctrine would be unavailing here, for the same reasons it was unavailing with respect to Counts 1 and 2.

the notice requirements of the ESA, or the merits of the three claims.[17] When a plaintiff fails to provide any arguments in favor of his claims and offers no response to a defendant's arguments in favor of summary judgment on those claims, he has waived the claims. *See Goodpaster v. City of Indianapolis,* 736 F.3d 1060, 1075 (7th Cir. 2013) (holding that because the plaintiffs "did not provide the district court with any basis to decide their claims, and did not respond to the City's arguments, these claims are waived"); *Bonte v. U.S. Bank, N.A.*, 624 F.3d 461, 466 (7th Cir. 2010) ("Failure to respond to an argument . . . results in waiver."). We cannot act as both adjudicator and surrogate counsel for Plaintiffs, and it is beyond the scope of our authority to "supply the legal research and organization to flesh out a party's arguments." *Smith v. Town of Eaton, Ind.*, 910 F.2d 1469, 1471 (7th Cir. 1990).

The only basis Plaintiffs assert for avoiding summary judgment on these counts is a request for additional discovery pursuant to Federal Rules of Civil Procedure 56(d). Plaintiffs insist that discovery is warranted here because they expect that many of the records related to the project's impact on the Indiana bat post-date issuance of the ROD for Section 4 and thus are not included in the existing Administrative Record. Docket No. 166 at 43–44. Further, they contend that because they have brought these three counts under the "citizen suit" provision of the ESA, the APA's presumption against any extra-record discovery should not apply. *Id.*

The ESA's "citizen suit" provision, 16 U.S.C. § 1540(g)(1), provides a cause of action to enjoin certain agency conduct that is separate from the APA; judicial review of agency action in these citizen suits is not necessarily confined to the administrative record. *See Nw. Coal. for Alternatives to Pesticides v. U.S. Envtl. Prot. Agency*, 920 F. Supp. 2d 1168, 1175–1176 (W.D.

---

[17] Plaintiffs' only response to any of Defendants' arguments is to argue briefly that Count 11 is not moot. Docket No. 166 at 44.

Wash. 2013). But, as INDOT points out, Plaintiffs have not demonstrated that they complied with the ESA's strict 60-day notice requirement for such suits. Docket No. 161 at 38. Their utter failure to respond to this argument constitutes a concession of the issue. *See Goodpaster,* 736 F.3d at 1075. These claims are therefore subject to the default standard of review provided by Section 706 of the APA. 5 U.S.C. § 706. As noted previously, Plaintiffs have failed to demonstrate that Defendants' conduct in this case presents special circumstances warranting inquiry beyond the Administrative Record. *Cf. Edwards v. U.S. Dep't of Justice*, 43 F.3d 312, 314 (7th Cr. 1994) (discussing the restrictive nature of APA record review). They present no new arguments with respect to Counts 10, 11, and 12 that Defendants created the Record in bad faith; rather, they incorporate by reference their arguments with respect to Count 7. *See* Docket No. 166 at 44. We have already determined that there is no evidence that the Record itself is misleading—or that Defendants engaged in "fraud on the court" or other flagrant misconduct— and we therefore reiterate our conclusion that the Court's review here is limited to the Record. *See supra,* § III(B)(3)(a)–(b).

Moreover, as Federal Defendants point out, the existing Record contains extensive post-decisional documents, including those relating to the issue of the Indiana bats. *See* Docket No. 158 (Record index). Even under the more liberal rules governing Rule 56(d) requests outside the APA context, Plaintiffs have failed to show their entitlement to additional discovery. They have neither submitted a declaration specifically describing the evidence they seek and its relevance to their claims nor demonstrated their previous diligence in seeking discovery. *Cf. Columbus Reg'l Hosp.*, 2012 WL 1066793, at *2. Plaintiffs' bare assertion that documents relating to impacts on the Indiana bat are likely to be found in post-decisional documents falls far short of the requirements this court has recognized. "In order to show that it cannot present facts essential to

justify its opposition, the non-moving party's affidavit should provide: (1) what facts are sought and how they are to be obtained; (2) how these facts are reasonably expected to create a genuine issue of material fact; (3) what efforts the affiant has made to obtain those facts; and (4) why these efforts were unsuccessful." *Id.* Additionally, as we have previously explained, Plaintiffs' argument for more discovery is severely undermined by their dilatory pursuit of discovery throughout this litigation, including their failure to meet more than one court-imposed deadline for presenting challenges to the sufficiency of the Administrative Record. *See supra,* § III(B)(3)(b); *Cf. Audi AG v. D'Amato*, 469 F.3d 534, 541 (6th Cir. 2004) (whether plaintiff has been "dilatory" in seeking discovery is to be considered in weighing a Rule 56(d) motion).

We conclude that, under either the standards governing APA review or the more general principles of Rule 56(d), Plaintiffs have not demonstrated the necessity of looking beyond the Administrative Record or of granting them more time to seek its enlargement. Because they have offered no other response to Defendants' arguments against Counts 10, 11, and 12 on jurisdictional grounds or on the merits, we accordingly grant Defendants' motions for summary judgment on these claims.

## Conclusion

For the foregoing reasons, Defendants' motions for summary judgment are GRANTED on all remaining counts of the Amended Complaint. Plaintiffs' partial motion for summary judgment and Plaintiffs' second motion for preliminary injunction are accordingly DENIED. The Court will enter judgment in favor of Defendants and against Plaintiffs.

IT IS SO ORDERED.

Date: ___3/31/2014_____

SARAH EVANS BARKER, JUDGE
United States District Court
Southern District of Indiana

Distribution:


Mick G. Harrison
mickharrisonesq@earthlink.net

William G. Malley
wmalley@perkinscoie.com

Daniel P. King
FROST BROWN TODD LLC
dking@fbtlaw.com

Timothy J. Junk
OFFICE OF THE ATTORNEY GENERAL
tim.junk@atg.in.gov

Albert M. Ferlo
PERKINS COIE LLP
aferlo@perkinscoie.com

Elisabeth C. Frost
PERKINS COIE LLP
efrost@perkinscoie.com

Daniel W. Pinkston
U.S. DEPARTMENT OF JUSTICE
daniel.pinkston@usdoj.gov

John Brett Grosko
U.S. DEPARTMENT OF JUSTICE
brett.grosko@usdoj.gov

Shelese M. Woods
UNITED STATES ATTORNEY'S OFFICE
shelese.woods@usdoj.gov

Jared S. Pettinato
UNITED STATES DEPARTMENT OF JUSTICE
jared.pettinato@usdoj.gov

Jean Marie Blanton
ZIEMER STAYMAN WEITZEL & SHOULDERS LLP
jblanton@zsws.com